JS-6

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DONNY MACIAS, | Case No. 2:20-cv-08423-DDP (SKx) (Consolidated) |
| vs. | |
| SAFESHRED CO., INC., | |
| Defendant. | |
| LOS ANGELES WATERKEEPER, | 2:20-cv-10176-DDP (SKx) |
| Plaintiff, | CONSENT DECREE |
| vs. | |
| SAFESHRED CO., INC., | (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |
| Defendant. | |

## CONSENT DECREE

The following Consent Decree is entered into by and between Plaintiffs Los Angeles Waterkeeper ("Plaintiff" or "Waterkeeper") and Donny Macias (collectively "Plaintiffs") and Defendant Safeshred Co., Inc. ("Defendant" or "Safeshred").  The entities entering into this Consent Decree are each an individual "Settling Party" and collectively the "Settling Parties" or "Parties."

**WHEREAS**, Waterkeeper is a 501(c)(3) non-profit public benefit corporation organized under the laws of the State of California, with its main office in Santa Monica, California;

**WHEREAS**, Waterkeeper is dedicated to the preservation, protection, and defense of the inland and coastal surface and ground waters of Los Angeles County from all sources of pollution and degradation;

**WHEREAS**, Donny Macias is a citizen of the State of California.

**WHEREAS**, Mr. Macias is concerned with the environmental health of the Los Angeles River and overall Los Angeles River Watershed, of which the Los Angeles River is a part, and uses and enjoys the waters of the Los Angeles River, its inflows, outflows, and other waters of the Los Angeles River Watershed;

**WHEREAS**, Safeshred is the owner and operator of a facility located at 5928 S. Malt Ave. in Commerce, California that stores, shreds, and bales recyclable paper and cardboard and stores electronic waste for transfer to other disposal facilities, hereinafter referred to by the Settling Parties as the "Facility";

**WHEREAS**, the Facility falls within Standard Industrial Classification ("SIC") code 5093 ("Scrap and Waste Materials");

**WHEREAS**, Mr. Macias and Waterkeeper's members live and/or recreate in and around the Commerce area waterbodies receiving discharges from the Facility, including the Los Angeles River Basin;

**WHEREAS**, storm water discharges associated with industrial activity at the Facility are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order No. 92-12-DWQ (as amended by Water Quality Order 97-03-DWQ and as subsequently amended by Water Quality Order No. 2014-0057-DWQ) (hereinafter the "Permit"), issued pursuant to Section 402 of the Federal Water Pollution Control Act ("Clean Water Act" or "the Act"), 33 U.S.C. §§ 1251 *et seq.*;

**WHEREAS**, Mr. Macias issued to Safeshred a notice of intent to file suit under Sections 505(a)(1) and (f) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A) ("60-Day Notice letter") dated April 14, 2020, alleging violations of the Act and the Permit at the Facility, which listed the Administrator of the United States Environmental Protection Agency ("EPA"), the Executive Director of the State Water Resources Control Board ("State Board"), the Executive Officer of the Los Angeles Regional Water Quality Control Board ("Regional Board"), the U.S. Attorney General, and the Regional Administrator of the EPA (Region 9) as additional recipients;

**WHEREAS**, Waterkeeper issued to Safeshred a 60-Day Notice letter dated August 31, 2020, alleging violations of the Act and the Permit at the Facility, which included a service list identifying the EPA, the State Board, the Regional Board, the U.S. Attorney General, and the Regional Administrator of the EPA (Region 9) as additional recipients;

**WHEREAS**, on September 15, 2020, Mr. Macias filed a complaint against Safeshred in the United States District Court, Central District Court of California, entitled *Donny Macias v. Safeshred Co., Inc.* (Case No. 2:20-cv-08423-DDP (SKx)), alleging violations of Section 301(a) of the Clean Water Act, <u>33 U.S.C. § 1311(a)</u>, and violations of the Permit at the Facility ("Macias Complaint") based on his 60-Day Notice letter;

**WHEREAS**, on November 5, 2020, Waterkeeper filed a complaint against Safeshred in the United States District Court, Central District Court of California, entitled *Los Angeles Waterkeeper v. Safeshred Co., Inc.* (Case No. 2:20-cv-10176-DDP (SKx)), alleging violations of Section 301(a) of the Clean Water Act, <u>33 U.S.C. § 1311(a)</u>, and violations of the Permit at the Facility ("Waterkeeper Complaint") based on its 60-Day Notice letter;

**WHEREAS**, on November 9, 2021, the Court ordered the two cases to be related and transferred the Waterkeeper Complaint to the Honorable Judge Dean D. Pregerson;

**WHEREAS**, Plaintiffs contend in their 60-Day Notice letters and Complaints that, among other things, Safeshred has repeatedly discharged polluted storm water in violation of the Permit and the Clean Water Act;

**WHEREAS**, Safeshred denies Plaintiffs' allegations as set forth in the answers it filed to the Macias Complaint on November 30, 2020 and to the Waterkeeper Complaint on December 21, 2020, respectively;

**WHEREAS**, solely for the purposes of this Consent Decree, the Parties agree that the Court has jurisdiction over the Parties and the subject matter of this action

under Section 505(a)(l)(A) of the Clean Water Act, 33 U.S.C. § 1365(a)(1)(A);

**WHEREAS**, on September 30, 2021, the Settling Parties filed a stipulated request for the Court to consolidate the two cases in order to facilitate the entry of the settlement agreed to by all of the Settling Parties, avoid confusion in the review of the proposed Consent Decree by EPA and the U.S. Attorney General, and result in the entry by the Court of a single Consent Decree, which request remains pending;

**WHEREAS**, the Settling Parties, through their authorized representatives and without either adjudication of Plaintiffs' claims or any admission by Safeshred of any alleged violation or other wrongdoing, believe it is in their mutual interest and choose to resolve in full Plaintiffs' allegations in the 60-Day Notice letters and Complaints through settlement and avoid the cost and uncertainties of further litigation;

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES, AND ORDERED AND DECREED BY THE COURT, AS FOLLOWS:**

1.     The Court has jurisdiction over the subject matter of this action pursuant to Section 505(a)(l)(A) of the Clean Water Act, 33 U.S.C. § 1365(a)(1)(A);

2.     Venue is appropriate in the Central District of California pursuant to Section 505(c)(l) of the Clean Water Act, 33 U.S.C. § 1365(c)(1), because the Facility at which the alleged violations took place is located within this District;

3.     The Court shall retain jurisdiction over this matter for purposes of enforcing the terms of this Consent Decree for the life of the Consent Decree, or as long thereafter as is necessary for the Court to resolve any motion to enforce this Consent Decree.

4.      This Consent Decree, and any relief ordered within, applies solely to Defendant's storm water discharges from the Facility subject to the Permit.

I.      **OBJECTIVES**

5.      It is the express purpose of the Settling Parties entering into this Consent Decree to further the objectives set forth in the Clean Water Act, 33 U.S.C. §§ 1251, *et seq.,* and to resolve those issues alleged by Plaintiffs in their Complaints.  In light of these objectives and as set forth fully below, Defendant agrees to use its best efforts to comply with the provisions of this Consent Decree and to use its best efforts to comply with all applicable requirements of the Permit and all applicable provisions of the Clean Water Act at the Facility.

II.     **COMMITMENTS OF SAFESHRED**

6.      Safeshred shall continue to implement appropriate structural and non-structural best management practices ("BMPs"), as required by the Permit.

7.      **Maintenance of Implemented Storm Water Controls.**  Safeshred agrees to continue to implement its adaptive management approach for addressing storm water discharges from the Facility.  Specifically, Safeshred shall use its best efforts to maintain in good working order all storm water collection and management systems currently installed or to be installed pursuant to this Consent Decree, including but not limited to, existing housekeeping measures; provided, however, it is understood and agreed by the Parties that nothing in this Consent Decree prohibits Safeshred from enhancing, improving, or otherwise modifying the storm water collection and management systems currently installed at the Facility in accordance with its adaptive management approach. Currently installed management practices

include, but are not limited to, the following:

    a.  Berms and speed bumps directing all storm water flows from the Facility to a single discharge point located at the southwest corner of the Facility and labeled as DP-1. *See* Exhibit A (Facility Site Map).

    b.  Outdoor materials storage areas are located away from concentrated storm water flow paths around the Facility.

    c.  Drums, roll-off containers and bins stored outdoors are equipped with covers and/or will be covered prior to forecast rain events with 50% or greater chance of precipitation over 0.1 inches.

    d.  Deployment of multiple layers of filtration socks (Filtrexx Envirosoxx and BiocharBASIC) upstream of DP-1 prior to forecast rain events of 50% or greater probability and over 0.1 inches using media designed to reduce total suspended solids ("TSS") and metal concentrations.

    e.  During the 2021-2022 rainy season, bench-scale media testing will be conducted using a flow-through column test apparatus, the results of which will inform and support the development of future BMP recommendations (e.g., additional enhanced media for storm water filtration), to evaluate the treatability of storm water at the Property and the deployment of additional or alternate filtration.

    f.  Annual storm water training seminars for Safeshred staff.

8.    **Additional Treatment if NAL Exceedances in 2022-2023.** If, at the conclusion of the 2022-2023 Reporting Year on June 30, 2023, either (1) the average

concentration of any parameter using the results of all the sampling obtained during QSEs and analytical results for the entire Facility for the 2022-2023 Reporting Year exceed any Annual Numeric Action Level set forth in Table 2 of the Permit, or (2) the concentration of TSS in any two samples obtained during QSEs exceed the Instantaneous Maximum NAL for TSS of 400 mg/L, Safeshred shall, by not later than October 1, 2023, install an Aquip storm water filtration system (manufactured by StormwateRx) and generally described in the attached Exhibit B ("Aquip System"), or an equivalent storm water treatment system.

    a. If, not later than October 1, 2022, Safeshred installs any additional storm water treatment system at the Facility other than an Aquip System or equivalent system, only the sampling obtained during QSEs and analytical results for the entire Facility that occur after the installation of such additional system (calculated pursuant to Paragraph 8) shall be used for the purposes of evaluating the need for installation of the Aquip System or an equivalent storm water treatment system described in the preceding paragraph.

    b. By not later than February 1, 2023, Safeshred may submit a plan to Plaintiffs identifying an alternative treatment system that Safeshred has determined would be equally or more effective in meeting the NALs at the Facility as the Aquip System. The plan must include sufficient information, including available influent and effluent data from the manufacturer, storm flow rate capabilities, and other relevant information, necessary to demonstrate to Plaintiffs and their

consultant(s) that the alternative treatment system is equally effective at removing pollutants from industrial storm water from the Facility as would be achieved by the installation of the Aquip System.

i.  Within thirty (30) days of Plaintiffs' receipt of an alternative treatment system plan described in the preceding paragraph, the Parties shall meet and confer to discuss whether they concur that the alternative treatment system is equivalent in treatment effectiveness to the Aquip System. Plaintiffs shall not withhold their concurrence in an alternative treatment system proposed by Safeshred if Safeshred demonstrates that the alternative treatment system is equally effective at removing pollutants from industrial storm water as would be achieved by the installation of the Aquip System.

ii.  Any concurrence by Plaintiffs with regard to the reasonableness or effectiveness of any alternative treatment system proposed by Safeshred shall not be deemed to be an admission of the adequacy of such treatment measure to achieve the Permit's best available technology requirements should the alternative treatment system fail to reduce pollutants in the Facility's storm water to levels below any NAL.

iii.  If no proposal for an alternative treatment system is submitted by Safeshred prior to February 1, 2023, Safeshred shall install the Aquip System. If the Settling Parties do not concur by

March 31, 2023 that an alternative treatment system proposed by Safeshred is equally effective as the Aquip System, not later than April 4, 2023 Safeshred shall present the alternative treatment proposal, along with any written comments on the system prepared by Plaintiffs, to mediator Jad Davis or a mediator satisfactory to the Parties if Mr. Davis is not available. By not later than April 28, 2023, the mediator shall make a determination whether Safeshred's proposal demonstrates by a preponderance of evidence that the alternative treatment system is equally effective at removing pollutants from industrial storm water as would be achieved by the installation of the Aquip System. The mediator shall immediately notify the Parties of the determination. The mediator's determination will be final and not subject to challenge on any grounds in any forum by any of the Parties. By not later than October 1, 2023, Safeshred shall install either the Aquip system or the proposed alternative treatment system consistent with the mediator's determination. Safeshred shall be responsible for fees and costs incurred by the mediator in carrying out the review prescribed in this subparagraph.

c.  The Aquip System, or any agreed upon alternative treatment system, shall be configured to meet the applicable Annual NALs and Instantaneous Maximum NALs set forth in the Permit.

d.  The Aquip System, or any agreed upon alternative treatment system, shall be sized, at a minimum, in accordance with the "Design Storm Standards for Treatment Control BMPs" requirements set forth in Section X.H.6 of the Permit.

9.      Within fourteen (14) days of completing the installation and initial operation of the Aquip System, or any agreed upon alternative treatment system, Safeshred shall confirm the installation of the Aquip System or alternative system by forwarding to Plaintiffs photographs of the installed treatment system and a certification that installation of the treatment system has been completed and the treatment system is fully operational.

10.     "Reporting Year" is defined in the same way as the term is used in the Permit (July 1 to June 30).

11.     A QSE is defined consistent with Permit, Section XI.B(1).

12.     All sampling and analysis shall be conducted consistent with the Permit, Section XI.B.

13.     **Amendment of SWPPP.**  Within thirty (30) days of the installation of the Aquip System or an equivalent storm water treatment system, Safeshred shall amend the Facility's Storm Water Pollution Prevention Plan ("SWPPP") to incorporate all changes, improvements, and best management practices set forth in or resulting from installation of such systems.  A copy of the amended SWPPP shall be provided to Plaintiffs within ten (10) business days of completion.

14.     **Provision of Documents and Reports.**  During the term of this Consent Decree, Safeshred shall notify Plaintiffs within five (5) business days after it uploads

to SMARTS any document related to storm water quality at the Facility.  Safeshred shall copy Plaintiffs on its submittal of any document and/or written communication that is not uploaded via SMARTS that is related to storm water quality at the Facility to any state or local agency or municipality.  Any correspondence related to storm water quality received by Safeshred from any state or local agency or municipality shall be provided to Plaintiffs within ten (10) business days of receipt by Safeshred.

15.  **Provision of Sampling Results**. Results from the Facility's sampling and analysis during the term of this Consent Decree shall be provided to Plaintiffs within thirty (30) days of receipt of the validated sampling results by Safeshred or its counsel.

16.  **Site Inspections.**  Plaintiffs and their representatives may conduct up to one site inspection per Reporting Year at the Facility during the life of this Consent Decree. Each site inspection shall occur during normal business hours and shall be subject to all applicable access, health and safety requirements ordinarily used by the Facility for visitors and contractors (including any applicable COVID-19 safety requirements). The Settling Parties shall work in good faith to select a mutually acceptable date or dates for the inspections, which will be scheduled at least ten (l0) business days in advance. Defendants' personnel or consultants may accompany Plaintiff's representative(s) throughout the site inspections.

III.  **MITIGATION PAYMENT, REIMBURSEMENT OF LITIGATION FEES AND COSTS, OVERSIGHT, AND STIPULATED PAYMENTS**

17.  **Mitigation Payment.**  In recognition of the good faith efforts by Safeshred to comply with all aspects of the Permit and the Clean Water Act, and in

lieu of payment by Safeshred of any penalties, which have been disputed but may have been assessed in this action if it had been adjudicated adverse to Safeshred, the Settling Parties agree that Safeshred will pay the sum of Thirty Thousand Dollars ($30,000) to the Rose Foundation for Communities and the Environment ("Rose Foundation") for the sole purpose of providing grants to environmentally beneficial projects, not including litigation, relating to water quality improvements in Los Angeles County watersheds.  Payment shall be provided to the Rose Foundation as follows: Rose Foundation, 201 4th Street, Suite 102, Oakland, CA 94607, Attn: Tim Little.  Payment shall be made by Safeshred to the Rose Foundation within thirty (30) calendar days of the Effective Date.  Safeshred shall copy Plaintiffs with any correspondence and a copy of the check sent to the Rose Foundation.  The Rose Foundation shall provide notice to the Settling Parties within thirty (30) days of when the funds are dispersed by the Rose Foundation, setting forth the recipient and purpose of the funds.

18.     **Reimbursement of Fees and Costs.**  Safeshred shall reimburse Plaintiffs in the amount of One Hundred Thirteen Thousand Dollars ($113,000.00 ) to help defray Plaintiffs' reasonable investigation, expert, and attorneys' fees and costs, and all other reasonable costs incurred as a result of investigating the activities at the Facility related to this Consent Decree, bringing these matters to Safeshred's attention, and negotiating a resolution of this action in the public interest.  The payment shall be made within thirty (30) days of the Effective Date.  The payment shall be made via check, made payable to: "Lozeau Drury LLP" and mailed to Lozeau Drury LLP, c/o Michael Lozeau, 1939 Harrison Street, Suite 150, Oakland, CA

94612.

19.     **Compliance Monitoring Funds.**  Safeshred shall make a one-time payment of Twelve Thousand Dollars ($12,000) to compensate Plaintiffs for costs and attorney fees to be incurred for monitoring Safeshred's compliance with this Consent Decree. Payment shall be made within thirty (30) days of the Effective Date. The payment shall be made via check, made payable to: "Los Angeles Waterkeeper" via certified mail, return receipt requested to Los Angeles Waterkeeper, c/o Kelly Clark, 120 Broadway, Suite 105, Santa Monica, California 90401. Defendant shall not be responsible for any other costs or fees that may be incurred by Plaintiffs prior to the Termination Date.

### IV.     COMMITMENT OF PLAINTIFFS

20.     **Submission of Consent Decree to DOJ.**  Within three (3) business days of receiving all of the Settling Parties' signatures to this Consent Decree, Plaintiffs shall submit this Consent Decree to the U.S. Department of Justice ("DOJ") and EPA for agency review consistent with 40 C.F.R. §135.5.  The agency review period expires forty-five (45) calendar days after receipt by the DOJ, evidenced by correspondence from DOJ establishing the review period.  If for any reason the DOJ or the District Court should decline to approve this Consent Decree in the form presented, the Parties shall use their best efforts to work together to modify the Consent Decree within thirty (30) days so that it is acceptable to the DOJ or the District Court.  If the Parties are unable to modify this Consent Decree in a mutually acceptable manner that is also acceptable to the District Court, this Consent Decree shall immediately be null and void as well as inadmissible as a settlement

communication under Federal Rule of Evidence 408 and <u>California Evidence Code</u> <u>section 1152</u>.

21.     During the effective period of this Consent Decree set forth in Paragraphs 28 and 29, Plaintiffs shall not support other lawsuits, by providing financial assistance, personnel time or other affirmative actions, against the Facility that may be proposed or pursued by other groups or individuals who would rely upon the citizen suit provision of the Clean Water Act to challenge the Facility's compliance with the Permit or any successor thereto.

## V.     <u>WAIVER, RELEASES, AND COVENANTS NOT TO SUE</u>

22.     In consideration of the above, and except as otherwise provided by this Consent Decree, the Parties hereby forever and fully release each other and their respective parents, affiliates, subsidiaries, divisions, insurers, successors, assigns, and current and former employees, attorneys, officers, directors and agents from any and all claims and demands of any kind, nature, or description whatsoever, and from any and all liabilities, damages, injuries, actions or causes of action, either at law or in equity, which the Parties have against each other arising from Plaintiffs' allegations and claims as set forth, or as could have been set forth, in the 60-Day Notice Letters and Complaints for any and all violations of the Permit or the Clean Water Act at the Facility up to and including the Termination Date of this Consent Decree.

23.     The Parties acknowledge that they are familiar with section 1542 of the California Civil Code, which provides:

A general release does not extend to claims that the creditor or

releasing party does not know or suspect to exist in his or her favor at

the time of executing the release and that, if known by him or her,

would have materially affected his or her settlement with the debtor or

released party.

Except as otherwise provided by this Consent Decree, the Parties hereby waive and

relinquish any rights or benefits they may have under California Civil Code section

1542 with respect to any other claims against each other arising from, or related to,

the allegations and claims as set forth in the 60-Day Notice Letters and Complaints for

alleged Clean Water Act violations up to and including the Termination Date of this

Consent Decree.

24.    **No Admission.**  The Parties enter into this Consent Decree for the

purpose of avoiding prolonged and costly litigation.  Nothing in this Consent Decree

shall be construed as, and Safeshred expressly does not intend to imply, any

admission as to any fact, finding, issue of law, or violation of law, nor shall

compliance with this Consent Decree constitute or be construed as an admission by

Safeshred of any fact, finding, conclusion, issue of law, or violation of law.  However,

this paragraph shall not diminish or otherwise affect the obligation, responsibilities,

and duties of the Parties under this Consent Decree.

## VI.    BREACH OF CONSENT DECREE AND DISPUTE RESOLUTION PROCEDURES

25.    **Continuing Jurisdiction**. This Court shall retain jurisdiction over this

matter until the Termination Date identified in Paragraph 29 for the purposes of

implementing and enforcing the terms and conditions of this Consent Decree and

adjudicating all disputes among the Settling Parties that may arise under the

provisions of this Consent Decree, unless a Settling Party files and is granted a timely motion requesting an extension of time for the Court to retain jurisdiction. The Court shall have the power to enforce this Consent Decree with all available legal and equitable remedies, including contempt.

26.   **Informal Dispute Resolution**.  The Settling Parties will engage in "Informal Dispute Resolution" pursuant to the terms of this paragraph:

a. If a dispute under this Consent Decree arises, including whether any Settling Party believes that a violation of the Consent Decree has occurred, the Settling Parties will meet and confer (telephonically or in-person) within twenty-one (21) days of receiving written notification of a request for such meeting.  During the meet and confer proceeding, the Settling Parties will discuss the dispute and make reasonable efforts to devise a mutually acceptable plan, including implementation dates, to resolve the dispute.  The Settling Parties may, upon mutual written agreement, extend the time to conduct the meet and confer discussions beyond twenty-one (21) days.  If meet and confer discussions fail to resolve the dispute, the Settling Parties shall request a magistrate judge of this court to conduct a single mediation session pursuant to such procedures as the magistrate judge may require.  The mediation is to be held within forty-five (45) days of the conclusion of the meet and confer discussions, or as soon thereafter as the schedule of the magistrate judge will permit.

b.  If any Settling Party fails to meet and confer or mediate within the timeframes set forth in paragraph (a) directly above, or the meet and confer and mediation do not resolve the dispute, after at least twenty-one (21) days have passed after the meet and confer or mediation occurred or should have occurred, either Settling Party may initiate the "Formal Dispute Resolution" procedures outlined directly below.

27.   **Formal Dispute Resolution.**   In any action or proceeding which is brought by any Settling Party against any other Settling Party pertaining to, arising out of, or related to the requirements of this Consent Decree, the Settling Parties will first utilize the "Informal Dispute Resolution" proceedings set forth in the preceding paragraph and, if not successful, the Settling Parties will utilize the "Formal Dispute Resolution" procedures in this paragraph.  "Formal Dispute Resolution" will be initiated by filing a Motion to Show Cause or other appropriately titled motion ("Motion") in the United States District Court, Central District of California, to determine whether either party is in violation of the Consent Decree and, if so, to require the violating party to remedy any violation identified by the District Court within a reasonable time frame.  Litigation costs and fees incurred in the Formal Dispute Resolution process will be awarded in accord with the standard established by Section 505 of the Clean Water Act, 33 U.S.C. § 1365.

**VII.   MISCELLANEOUS PROVISIONS**

28.   **Effective Date.**   The "Effective Date" as used in this Consent Decree shall mean the date the Court enters the Consent Decree.

29.   **Termination Date.**   This Consent Decree shall terminate on December 1,

2024; provided, however, that if, at the conclusion of the 2022-2023 Reporting Year on June 30, 2023, the average concentration of all parameters using the results of all the sampling obtained during QSEs and analytical results for the entire Facility do not exceed any Numeric Action Level set forth in Table 2 of the Permit, then this Consent Decree shall terminate 60-days after such results are provided to Plaintiffs, provided there are no pending dispute resolution proceedings initiated under Paragraphs 26 and 27 and Defendant has completed all payments and affirmative duties required by the Consent Decree.  If, on December 1, 2024, any dispute resolution proceedings are pending or Defendant has failed to complete all payments and affirmative duties required by the Consent Decree, then the term of the Consent Decree shall be extended through completion of any such proceedings or obligations.

    30.    **Force Majeure.**  Safeshred's performance of the requirements in Section II of this Consent Decree shall be extended or modified in the case of a force majeure event, as follows:

        a.  A "force majeure event" is any event beyond the control of Safeshred that prevents or delays the performance of any requirement in Section II of this Consent Decree despite Safeshred's best efforts to fulfill the requirement. A force majeure event does not include a financial inability to perform a requirement.  A force majeure event includes governmental orders or restrictions relating to COVID-19 and similar public-health threats.

        b.  Safeshred shall provide notice to Plaintiffs by electronic transmission no later than fourteen (14) days after the time that Safeshred first

knew of, or by the exercise of due diligence, should have known of, a force majeure event. The notice shall state the anticipated duration of any delay, its cause(s), and propose an alternative schedule for performing the affected requirement(s).

c. If Plaintiffs agree that a force majeure event has occurred, Plaintiffs shall agree to extend the time for Safeshred to perform the affected requirement(s) for the time necessary to complete those obligations.

d. If Plaintiffs do not agree that a force majeure event has occurred or does not agree to the extension of time sought by Safeshred, the Parties may invoke the Dispute Resolution Procedure in Paragraphs 26 and 27 of this Consent Decree.

31. **Execution in Counterparts.**  The Consent Decree may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document.

32. **Facsimile Signatures.**  The Settling Parties' signatures to this Consent Decree transmitted by facsimile or electronic mail transmission shall be deemed binding.

33. **Construction.**  The language in all parts of this Consent Decree, unless otherwise stated, shall be construed according to its plain and ordinary meaning.  The captions and paragraph headings used in this Consent Decree are for reference only and shall not affect the construction of this Consent Decree.

34. **Authority to Sign.**  The undersigned are authorized to execute this Consent Decree on behalf of their respective parties and have read, understood and

agreed to all of the terms and conditions of this Consent Decree.

35. **Integrated Consent Decree.** All covenants, representations and warranties, express or implied, oral or written, of the Settling Parties concerning the subject matter of this Consent Decree are contained herein.

36. **Severability.** In the event that any of the provisions of this Consent Decree are held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

37. **Choice of Law.** This Consent Decree shall be governed by the laws of the United States, and where applicable, the laws of the State of California.

38. **Full Settlement.** This Consent Decree constitutes a full and final settlement of this matter. It is expressly understood and agreed that the Consent Decree has been freely and voluntarily entered into by the Settling Parties with and upon advice of counsel.

39. **Negotiated Consent Decree.** The Settling Parties have negotiated this Consent Decree, and agree that it shall not be construed against the party preparing it, but shall be construed as if the Settling Parties jointly prepared this Consent Decree, and any uncertainty and ambiguity shall not be interpreted against any one party.

40. **Modification of the Consent Decree.** This Consent Decree, and any provisions herein, may not be changed, waived, or discharged unless by a written instrument signed by the Settling Parties.

41. **Assignment.** Subject only to the express restrictions contained in this Consent Decree, all of the rights, duties and obligations contained in this Consent Decree shall inure to the benefit of and be binding upon the Settling Parties, and their

successors and assigns.

42.    **Mailing of Documents to Parties/Notices/Correspondence.**  Any notices or documents required or provided for by this Consent Decree or related thereto that are to be provided to Plaintiffs pursuant to this Consent Decree shall be, to the extent feasible, sent via electronic mail transmission to the e-mail addresses listed below or, if electronic mail transmission is not feasible, via certified U.S. Mail with return receipt, or by hand delivery to the following addresses:

> Los Angeles Waterkeeper
> Attention: Kelly Clark
> 120 Broadway, Suite 105
> Santa Monica, CA 90401
> E-mail: kelly@lawaterkeeper.org

> With copies sent to:

> Michael R. Lozeau
> Lozeau Drury LLP
> 1939 Harrison St., Suite 150
> Oakland, CA 94612
> E-mail:  michael@lozeaudrury.com

> Evan J. Smith
> Ryan P. Cardona
> BRODSKY & SMITH
> 9595 Wilshire Blvd., Ste. 900
> Beverly Hills , CA 90212
> Email: esmith@brodskysmith.com
> rcardona@brodskysmith.com

Unless requested otherwise by Safeshred, any notices or documents required or provided for by this Consent Decree or related thereto that are to be provided to Safeshred pursuant to this Consent Decree shall, to the extent feasible, be provided by electronic mail transmission to the e-mail addresses listed below, or, if electronic mail

transmission is not feasible, by certified U.S. Mail with return receipt, or by hand delivery to the addresses below:

> Masahiko Nagata, President
> Safeshred Co., Inc.
> 5928 S. Malt Ave.
> Commerce, CA 90040
> E-mail: mnagata@safeshred.com
>
> With copies sent to:
>
> R Raymond Rothman
> Morgan Lewis & Bockius LLP
> 300 South Grand Ave., 22nd Floor
> Los Angeles, CA 90071-3132
> E-mail: rick.rothman@morganlewis.com

Notifications of communications shall be deemed submitted on the date that they are emailed, or postmarked and sent by first-class mail or deposited with an overnight mail/delivery service.  Any changes of address or addressees shall be communicated in the manner described above for giving notices.

43. **Deadlines Falling on Non-Business Days.**  Any deadlines relating to this Consent Decree which fall on the weekend or on a federal holiday shall be extended to the following business day.

///

///

///

///

///

1    44.    The Settling Parties hereto enter into this Consent Decree, Order and

2  Final Judgment and submit it to the Court for its approval and entry as a final

3  judgment.

4

5  Date: ___10|30___ , 2021          LOS ANGELES WATERKEEPER

6

7                                     _____
8                                     Bruce Reznik
                                      Executive Director, Los Angeles Waterkeeper
9
   Date: _____ , 2021
10

11
                                      _____
12                                    Donny Macias

13 Date: _____ , 2021      SAFESHRED CO., INC.

14

15                                    _____
                                      Masahiko Nagata
16                                    President, Safeshred Co., Inc.

17
   Approved as to form:
18

19 Date: *October 20* , 2021          LOZEAU DRURY LLP

20                                    _____
21                                    Michael R. Lozeau
                                      Attorneys for Los Angeles Waterkeeper
22

23 Date: _____ , 2021      BRODSKY & SMITH, LLC

24

25                                    _____
26                                    Evan J. Smith
                                      Attorneys for Donny Macias
27

28

   [PROPOSED] CONSENT DECREE                    2:20-cv-08423-DDP (SKx) and 2:20-cv-10176-DDP (SKx)
                                            25

1    44.    The Settling Parties hereto enter into this Consent Decree, Order and

2  Final Judgment and submit it to the Court for its approval and entry as a final

3  judgment.

4

5  Date: _____ , 2021        LOS ANGELES WATERKEEPER

6

7

8                                       Bruce Reznik
                                        Executive Director, Los Angeles Waterkeeper
9
   Date:  10 / 20 / 2 2021
10

11

12                                      Donny Macias

13 Date: _____ , 2021        SAFESHRED CO., INC.

14

15

16                                      Masahiko Nagata
                                        President, Safeshred Co., Inc.
17
   Approved as to form:
18

19 Date: _____ , 2021        LOZEAU DRURY LLP

20

21                                      Michael R. Lozeau
                                        Attorneys for Los Angeles Waterkeeper
22

23 Date: 10 / 20 _____ , 2021        BRODSKY & SMITH, LLC

24

25

26                                      Evan J. Smith

27                                      Attorneys for Donny Macias

28

1    44.    The Settling Parties hereto enter into this Consent Decree, Order and

2   Final Judgment and submit it to the Court for its approval and entry as a final

3   judgment.

4

5   Date: _____, 2021          LOS ANGELES WATERKEEPER

6

7                                          _____
8                                          Bruce Reznik
                                           Executive Director, Los Angeles Waterkeeper
9
10  Date: _____, 2021

11

12                                         _____
                                           Donny Macias
13  Date: __10/21_____, 2021          SAFESHRED CO., INC.

14

15                                         _____
                                           Masahiko Nagata
16                                         President, Safeshred Co., Inc.

17
    Approved as to form:
18

19  Date: _____, 2021          LOZEAU DRURY LLP

20

21                                         _____
                                           Michael R. Lozeau
22                                         Attorneys for Los Angeles Waterkeeper

23  Date: _____, 2021          BRODSKY & SMITH, LLC

24

25

26                                         _____
                                           Evan J. Smith
27                                         Attorneys for Donny Macias

28

1

Date: ___October 21___, 2021      MORGAN LEWIS & BOCKIUS LLP

2

3                                                  _____

R Raymond Rothman

4                                                  Attorneys for Safeshred Co., Inc.

5

6

7      IT IS FURTHER ORDERED  all remaining dates for this calendar are
       hereby vacated.

8

9      IT IS SO ORDERED.

10

11

12      DATED: January 7, 2022

13                                                  _____

14                                                  HON. DEAN D. PREGERSON

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



# EXHIBIT B



# Stormwater Filtration System

## Technical Brief









# Fundamentals

▶ *Aquip® (uh-kwip) is a patented, multi-media filtration system for stormwater applications.*

This robust stormwater treatment Best Management Practice (BMP) produces good stand-alone stormwater quality for a wide range of industries, is easy to retrofit to existing stormwater collection and conveyance infrastructure, and requires no operator attention during rain events.[1]

Aquip uses passive adsorptive filtration technology designed specifically for reduction of stormwater pollutants such as suspended solids, turbidity, heavy metals, nutrients and organics from runoff. The system uses no chemicals and has no moving parts, making operation simple and

safe. Aquip's pre-treatment chamber in sequence with inert and adsorptive filtration media effectively trap pollutants in a media package that is flexible and reliable. Compliance samples are collected from a sample port at the outlet of the filter. Aquip has received a coveted third-party regulatory approval[2] for removal of particulates, dissolved metals and phosphorus from stormwater.

Below are photographs of samples taken before and after running through the Aquip filtration system. Aquip is an effective filter, producing good quality effluent under a range of influent stormwater quality conditions.




*Actual full-scale Aquip influent and effluent samples*




*Installation of an Aquip 50 system*

*Aerial view of an Aquip 400 system*



1 When properly maintained.
2 The Washington Department of Ecology has conditionally approved (CULD) the Aquip enhanced stormwater filtration system for use for basic, enhanced and phosphorus treatment. The CULD was granted as a part of the Technology Assessment Protocol Ecology (TAPE) process upon review by a Board of External Reviewers consisting of stormwater experts from across the United States. According to Ecology, "...several other states, counties, and cities use TAPE certification to determine whether a technology can be installed within their jurisdiction, including Sacramento CA, Denver CO, St. Louis MO, the State of New Hampshire, Portland OR, the Oregon Department of Transportation, and the State of Rhode Island. Aquip is arguably the first and only industrial stormwater treatment BMP approved for the treatment of solids, metals, and nutrients." The CULD approval means that Aquip can be specified and is approved for use on new and redevelopment projects in Washington as well as retrofits without additional review.



## Reclaiming the World's Water.®



# Performance

▶ *Aquip performance has been demonstrated at a wide range of industrial sites…*

…including scrap and recycling, galvanizing, metal fabrication, wood treating, automobile salvage, transportation equipment, food processing, power generation, marine and a host of others. Representative performance data from Aquip are presented in the figure below. As the data show, Aquip produces good quality stormwater effluent for the regulated stormwater pollutants as well as for many pollutants that are not currently regulated, but may be in the future.



Median values reported for each sample set:

"Box" Range = 25th - 75th percentile

"Whisker" Range = 5th - 95th percentile



before treatment
after treatment

Data set includes some non detected (ND) values reported at ½ the detection limit for purposes of statistical ranges.







*Particle size cutoff for Aquip filtration system is approximately 3 microns. Third-party sampling and analysis of influent and effluent stormwater from an Aquip 160SBE filtration system at design flow rates showed influent particle size ranging from 0-200 microns (mean particle size 42 microns) and effluent particle size ranging from 0-2.8 microns (mean particle size 1 micron). The results verified that Aquip filtration system removes a range of particle sizes from sand and silt to medium/fine clays.







Pretreatment chamber

Filtration chamber

**2**

**3**

**6**

**1**

Inlet

**4**

stormwateRx
a newterra company

**5**

**7** Outlet

Forklift pockets allow easy installation.

US Pat. 8,002,974    CON Pat. 2,640,809

aquip

**8**

Sample port

**1  Inlet:** Polluted stormwater flows into Aquip via the inlet pipe, then into the pretreatment chamber. In most cases stormwater is pumped to Aquip using a simple float-actuated stormwater pump. To assist with predictive maintenance, a totalizing flow meter on the system lets owners track the rate and volume of stormwater treated.

**2  Pretreatment Chamber:** This chamber is customized to naturally balance the water chemistry and improve the removal efficiency of the treatment. The pretreatment process works synchronously with Aquip's filtration media to settle solids, remove free oil, and to create metal complexes that are more easily removed in the filtration chamber. A pretreatment pump may be included on certain models to encourage aerobic conditions and to draw down the standing water level between storm events. A mosquito barrier is provided for systems without a pretreatment pump.

**3  Inlet Distributor:** Water from the pretreatment chamber flows by gravity into the inlet distributor and is dispersed along the full length of the filter media bed, optimizing the contact area of stormwater with filtration media. Energy dissipation fabric lies beneath the distributor to prevent scouring of the media bed.

**4  Filtration Chamber:** Layers of inert and adsorptive media remove stormwater pollutants such as metals, particulates, oil, organics and nutrients. Within the filtration chamber, pollutant removal occurs through

a combination of straining, filtration, complexing, adsorption, absorption, micro-sedimentation, and biological degradation, producing excellent stormwater quality. Once passed through the media bed, clean stormwater flows into the high efficiency underdrain and out of the system, leaving the targeted pollutants permanently trapped in the filter bed. The filter bed drains down between storm events. Integrated ladders, filter maintenance tools and an external filter bed drain-down make routine maintenance without special equipment simple.

**5  Adjustable Head Control:** Clean stormwater leaving the system passes through the adjustable head control. This device can be adjusted in the field and assures optimal water/filter media contact under a range of operating conditions.

**6  Emergency Overflow:** In the event that the filter bed becomes plugged during a rain event, the emergency overflow allows the stormwater to bypass. Filter bed plugging is avoided by maintaining the system per StormwateRx recommendations.

**7  Outlet:** Clean stormwater discharges from the Aquip unit by gravity through the outlet.

**8  Outlet Sample Port:** This port provides safe and easy access to system effluent for stormwater compliance sampling.





# Reclaiming the World's Water.®



# Product Configurations

▶ *Aquip is available in a number of modular configurations.*

Whether the structure is steel, plastic, concrete, fiberglass, earthen, or owner-supplied, Aquip owners can expect the same high level of performance and reliability StormwateRx products are known for. Available upgrades for Aquip include freeze protection, covers and seismic tie-downs.

## Retrofit

Our most popular Aquip configuration, Aquip in a steel or recyclable plastic configuration for above-ground applications, can be moved into place quickly and can be operational in as little as one day.

- Easy to install with a forklift
- Open top for easy access and simple inspection
- Built-in ladders allow simple maintenance
- Nine sizes available for flow rates up to 600 gpm



## New Construction

Suitable for buried or full gravity applications, this Aquip configuration is designed as a pre-cast concrete vault or panel-vault. The below-ground configuration can be supplied with a solid lid for traffic-rated applications or with an open top for easy inspection and maintenance.

- Ideal for large sites subject to freezing weather or where space is at a premium
- Often used for new or redeveloped industrial sites
- Flexible layout to accommodate varying site orientations
- Flow rate virtually unlimited



## Portable

Aquip 10P and 25S are small-scale, passive water treatment technologies ideal for enhanced filtration of stormwater runoff from small sites, or for use in washwater pre-treatment applications. The 10P (available in plastic) and the 25S (made of steel) are both easily moved with a forklift and come ready to install and operate: simply connect to your pump and outlet.





1.800.680.3543 | stormwaterx.com



# Sizing

| Aquip Model | Treatment Rate (gpm)* | | Sizing Guideline (acres)* | Footprint (ft x ft) |
|---|---|---|---|---|
| | Standard | Range | | |
| 10 | 10 | 5 – 15 | < 0.25 | 3' x 9' |
| 25 | 25 | 12 – 40 | 0.25 – 0.5 | 5' x 9' |
| 50 | 50 | 25 – 75 | 0.5 – 1 | 7' x 12' |
| 80 | 80 | 40 – 120 | 1 – 2 | 7' x 16' |
| 110 | 110 | 60 – 170 | 2 – 3 | 8' x 18' |
| 160 | 160 | 80 – 240 | 3 – 4 | 8' x 27' |
| 210 | 210 | 100 – 320 | 4 – 5 | 8' x 32' |
| 300 | 300 | 150 – 450 | 5 – 8 | 13' x 36' |
| 400 | 400 | 200 – 600 | 6 – 10 | 13' x 47' |

*Varies by region*











Reclaiming the World's Water.®



# Site Configurations



**Aquip Downstream of Clara®**



**Aquip Downstream of Bypass Pump Vault**



**Aquip Downstream of Detention**





   

   

   

   

*"StormwateRx represents best-of-class solutions that provide a ROI every manger will appreciate. Given the choice to proactively make a capital investment versus being subject to third party lawsuits, I will always choose to invest in the future of our business. This is why we partnered with StormwateRx."*
— Edward Kangeter IV, CEO, CASS, Inc., Oakland, California, USA

*"Canal Boatyard is known as one of the cleanest facilities on the waterfront. We are proud to be at the forefront of the effort to keep runoff pollution to a minimum. The 2009 installation of the StormwateRx system filters runoff water from the entire yard; ensuring contaminants don't make it into the waterway."*
— Ivaylo Minkov , Manager, Canal Boatyard, Seattle, Washington, USA

*"Locally-available treatment systems seemed to offer a short-term solution, but we wanted to future-proof our site for generations to come, and we found the ability to do so with the systems we invested in from StormwateRx."*
— Trevor Munro, Managing Director, Metalcorp NZ Ltd., Christchurch, New Zealand

*"We are always looking for ways to improve the efficiency and sustainability of our operations, and making sure we have the best stormwater treatment equipment is part of that commitment. The StormwateRx treatment train has put Davis Industries at the forefront of environmental technology for the scrap metal recycling industry and we are proud to own one of the most environmentally protective systems on the East Coast."*
— Bill Bukevicz, Executive Vice President, Davis Industries, Lorton, Virginia, USA



## stormwateRx
### a newterra company

**1.800.680.3543 | 503.233.4660**
stormwaterx.com

StormwateRx and the Newterra logo are trademarks or registered trademarks of Newterra Group, Ltd. or its affiliates in the U.S. and other countries. Copyright © 2019 StormwateRx LLC and Newterra Group, Ltd. All rights reserved. Specifications are subject to change without notice.   09-2019 v019